# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

DAMIEN LEE,                          )
                                     )
Plaintiff,                           )
                                     )
vs.                                  )     NO. 3:07-CV-418
                                     )
AARON'S SALES AND LEASING,           )
and CIRCLE CITY RENTALS, LLC,        )
                                     )
Defendants.                          )


## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment, filed on November 02, 2009. For the reasons set forth below, the motion is **GRANTED.** The Clerk is **ORDERED** to **DISMISS** this case.


BACKGROUND

On August 10, 2007, Plaintiff, Damien Lee ("Lee"), filed a complaint in the Elkhart County Superior Court alleging racial discrimination and retaliation in violation of Sections 703 and 704 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000(e), as amended by the Civil Rights Act of 1991. Defendants then removed the case to this Court on September 6, 2007. In 2008, Defendants sought dismissal for lack of prosecution, or in the

alternative, summary judgment on each of Lee's claims. In September 2009, this Court denied the motion with leave to refile. In Defendants' instant motion for summary judgement, Defendants again argue that all of Plaintiff's claims should be dismissed.

At the time the instant motion for summary judgment was filed, Plaintiff was represented by counsel. Plaintiff's counsel, however, sought leave to withdraw. The initial request to withdraw was denied, but a subsequent request was granted. This Court allowed Plaintiff 45 days to both obtain new counsel and file a response. The Court provided notice pursuant to *Timms v. Frank*, 953 F.2d 281 (7th Cir. 1992) of the consequences for failing to respond properly to the summary judgment motion. Despite this notice, Plaintiff filed no response. Accordingly, this matter is ripe for adjudication.


DISCUSSION

Summary Judgment

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record

must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406 (7th Cir. 2009).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate,

by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.

Northern District of Indiana Local Rule 56.1 requires the moving party to file with the Court a "Statement of Material Facts" supported by appropriate citations to admissible evidence "to which the moving party contends there is no genuine issue." N.D. Ind. L.R. 56.1(a). In response, the opposing party is obligated to file with the Court a "Statement of Genuine Issues" supported by appropriate citation to admissible evidence to which "[i]t is contended there exists a genuine issue necessary to be litigated." *Id.* Furthermore, "[i]n determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the 'Statement of Genuine Issues' filed in opposition to the motion ...." L.R. 56.1(b); *see also Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir. 1994) (noting that the Seventh Circuit has routinely sustained "the entry of summary judgment when non-movant has failed to submit a factual statement

in the form called for by the pertinent rule and thereby conceded the movant's version of the facts"). In this case, as the moving party, the Defendant has submitted a Statement of Material Facts with appropriate citations to supporting evidence. However, Plaintiff has not submitted a response brief, much less a Statement of Genuine Issues; therefore, the following facts asserted by Defendant and supported by admissible evidence are considered to exist without controversy for the purposes of this motion for summary judgment.

<u>Facts</u>

Circle City Rentals, LLC ("Circle City") was established approximately twelve years ago by Jeff Furlin ("Furlin") and Jeff Kimbell ("Kimbell"). Circle City operates Aaron's Sales and Leasing ("Aaron's") stores throughout Northern Indiana. Aaron's employed Richard Carter ("Carter") as General Manager prior to Lee's employment.

In October of 2000, Lee was hired by Carter as a Product Technician at Aaron's Elkhart, Indiana store, earning $8.00 per hour. On June 11, 2001, Lee was promoted to Customer Accounts Manager, earning $9.25 per hour. Aaron's Customer Accounts Manager is responsible for the acquisition and maintenance of customers, as well as maintaining updated accurate customer information, collecting money and obtaining customers' signatures on lease

agreements.    Lee received a number of raises throughout his
employment with Aaron's and, in October of 2006, he was earning
$13.50 per hour.

On October 20, 2006, Lee was terminated.  Lee filed an EEOC
Charge of Discrimination the same day that he was terminated,
although this Charge does not include all the allegations made in
this lawsuit.

As of April 28, 2008, Circle City no longer operated the
Elkhart, Indiana store where Lee worked, but Circle City continued
to operate Aaron's franchises in Indiana.   While Circle City
operated the Aaron's store in Elkhart, both Furlin and Lamphier
routinely made in-person visits to the store.


Lee's Allegations of Harassment

Lee alleges 27 race-related incidents in his Responses to
Defendants' interrogatories.    The alleged incidents can be
summarized as follows:

(1) In December 2000, at a Christmas party, Carter called Lee
his "black man."

(2) In February 2001, Troy Schott asked why Lee was being
promoted, and Carter stated that a black monkey could do the job,
and that is why Lee was getting the job.

(3) In February 2001, Carter stated, after a customer pulled
up to the store with their music real loud, that it must be a black

thing because he can't stand rap music.

(4) In February 2001, Carter told Lee that Aaron's promotes from within, and that at this rate Lee would be the HNIC (or head nigger in charge) in no time.

(5) In April 2001, Carter stated that blacks were usually broke and the reason that Lee was collecting so well was because it takes one to know one.

(6) In July 2001, Carter stated that he never had a black Assistant Manager and that Lee would have to work extra hard if he wanted to keep the position.  He further stated that he was glad he "got a big black Negro on my side."

(7) In July 2001, while Lee was counting the cash drawer, Carter came into the office and said, "I bet that you have never counted that much money before.  Don't put any in your pocket."

(8) In August 2001, a black employee, Eddie Neal, was leaving because he had been given a position as a school teacher.  Carter stated that back in his day blacks were too dumb to become teachers.

(9) In December 2001, as Carter was leaving for vacation around Christmas, he stated to Lee, have a "black Christmas" and then laughed and got into his car and left.

(10) In April 2002, after talking with a black customer on the phone, Carter came into Lee's office and stated that he had the hardest time with black customers when they are late with their

payments.  He also said that he would rather pass all the blacks to someone on their level.

(11) In August 2002, a white female and black male came into the store.  Carter stated that he did not know why white women dated black guys because most of them are shit and treat them like shit.  He told Lee that the woman was a nigger lover and loved dark meat.

(12) In February of 2003, Lee told Carter that he was moving to Maple Lane Apartments in Elkhart.  Carter stated "isn't that a white high price area.  If you move up in there some people will most likely move out because I would because some niggers tear up shit."

(13) In May 2003, Lee asked Carter why he did not get his bonus for the charge-offs.  Lee stated that it was unfair.  Carter stated that some people think that freeing the slaves was unfair.

(14) In August 2003, Carter was making a phone call to a customer and the voice-mail was a rap song with the word nigger in it.  Carter came and asked Lee "why do we call each other nigger and why do we get upset when a white person says it."

(15) In September 2003, after Lee's performance appraisal, Carter stated that his real problem with Lee was that Carter was "not used to working with a black boy under his wing."

(16) In November 2003, Lee was talking to Carter about how he was moving to Ridge Wood Apartments with a friend to save money and

build a house.  Carter stated that Lee "was moving back to the getto with my kind."

(17) In March 2004, after hiring Vincent Murry, Carter stated that, since there were two blacks in the accounts department, Carter did not want us to be acting like we had black power.

(18) In March 2004, Carter stated that "now he has two slaves to do his dirty work."

(19) In May 2004, Carter was telling Lee how happy he was that James Tidwell was gone and stated that "we can be niggas because it is just you and I who are running things."

(20) In July 2004, Carter and Lee were talking about Lee's house being built and Carter stated that "the way I described my house people would think that I was nigga rich."

(21) In September 2004, Carter was calling a past due customer and they hung up on him.  Carter came to Lee and said that "some blacks are so niggerish."

(22) In March 2005, Vincent Murry and Lee were laughing in the office and Carter stated that "if it was dark outside that all he would be able to see was our teeth and eyes because we were so black."

(23) In September 2005, Carter was talking to a customer and after he got off the phone he came to Lee and Vincent Murry and started to say something.  Carter then stated, "Never mind, I don't want you guys pulling your black cards to Doug."

(24)  In November 2005, Lamphier and Lee were talking about Halloween and Lamphier stated that some trick-or-treaters had come to his door and he said to the trick-or-treaters that he "know you are not from my neighborhood."  When Lee asked why, he responded with "they were black."

(25)  On February 17, 2006, Lee was in his truck on his way to Meijer's in Elkhart, Indiana, when Carter and Michael Julia were unloading furniture from a distribution center truck.  Carter called Lee on his cell phone and said, "hey black boy, when are you coming in, you're fucking late."

(26)  In April 2006, Carter and Lee were in the office and out of nowhere Carter stated that "Furlin was giving him until July 2006 to find another job or they were going to fire him."  Lee asked why and Carter stated because Lamphier said that the niggers had gotten him fired and he couldn't save him this time.

(27)  On July 19, 2006, Carter said that he was quitting and moving to Texas because he was having an affair with Sally Masker.  Then Carter stated to Lee "that he didn't have to deal with my black ass anymore because his white ass will be gone in less than a month and he did not care anymore."

(Ex. J at 25-37).

These incidents span the years 2000-2006.  Most of these alleged incidents were learned by Aaron's management for the first time in this litigation when Lee responded to discovery requests,

but a few of these incidents were reported by Lee to Aaron's management on February 20, 2006.


## The February 20, 2006, Meeting and Follow-up

On February 20, 2006, Lee met with Furlin, Lamphier and Carter. At this meeting Lee, for the first time, reported race-related or discrimination incidents to the management at Aaron's. Although he had the opportunity to report these alleged racial incidents to Carol Dourum in 2006 and to Ray Muncy in 2005, both representatives from Aaron's corporate office, he did not do so. Aaron's has a strict anti-discrimination and anti-harassment policy that Lee was aware of throughout his employment. On October 31, 2005, and March 31, 2006, Lee signed a document acknowledging Aaron's anti-discrimination and anti-harassment policy in the workplace.

Furlin took notes at this meeting, and reports that the following complaints were made by Lee.

> a. That only African Americans were required to submit to drug testing while white employees were not;
> b. That Lee believed he was considered third in charge rather than second in charge;
> c. that Lee did not receive a $125.00 charge-off bonus he believed he was owed;
> d. That Lee believed Aaron's had discriminated against Gbrandon Hajicek, a delivery driver, by firing him for not having a driver's license;
> e. That Lamphier made a racist remark to Lee about trick-or-treaters;
> f. That Carter designated Lee as the

> "Customer Anger Manager" in Carter's company
> computer and made inappropriate comments in
> front of other employees about Lee needing
> anger management classes. Then when a
> customer called the store, Carter asked if
> "this was the girl he (Damien) beat up."
> g. Carter called Lee his "black man."
> h. Carter remarked to Lee after closing a
> deal: "She has big tits so I'll let it go."
> i. Lee stated that a former employee was
> fired for trying to use a $20.00 bill that was
> believed to be counterfeit. Lee placed a mark
> on the bill that showed it was counterfeit and
> reported this to management. Lee also called
> me and demanded a financial reward which was
> paid.
> j. When Lee did not receive a raise, he
> alleged that Lamphier told him he was doing
> this to make Lee mad.
> k. Lee reported that he felt underpaid. Lee
> was under the impression that Customer Account
> Managers in corporate stores made more money.
> Lee felt that his store was the most
> profitable and that he should be paid the most
> of all Customer Account Managers.

(Defendants' Ex. D ¶8).

Furlin had a follow-up conversation with Lee on February 22, 2006, to clarify Lee's complaints and to provide Lee an opportunity to discuss anything else that was bothering him. At the end of this conversation, Furlin asked Lee to contact him by noon on February 23, 2006, if Lee thought of anything else he wanted to discuss. Lee did not contact Furlin.

Furlin and Lamphier began an immediate investigation of the alleged racial remarks by Carter. Lamphier interviewed several associates, including Vincent Murry, who Lee alleges was harassed by Carter, and none of them expressed any concerns about Carter's

conduct. By March 8, 2006, Lamphier had investigated all of the complaints raised by Lee at that time.

At a follow up meeting with Furlin, Lamphier and Carter on March 8, 2006, Lee stated that he was okay with the investigation that was conducted and was ready to move forward. Because they believed Lee had waited too long to apprise them of his concerns, Furlin and Lamphier urged Lee not to wait to discuss any problems he was having, but to discuss concerns with Lamphier and/or Furlin promptly and professionally. Lee agreed to do so.

As a result of Lamphier's investigation, Carter received a written reprimand from Lamphier and Furlin, and Carter's performance was closely monitored. In June of 2006, Carter verbally resigned his employment, with notice, and his employment ended effective July 22, 2006. Lamphier and Furlin both believe that Carter resigned because he did not like being closely monitored.


2006 Openings for General Manager Positions at Aaron's

Aaron's has no record of Lee applying for the General Manager positions at its Mishawaka store in February of 2006 or its Elkhart or South Bend stores in June of 2006.

Michael Dutton (white) filled the position of General Manager of its Mishawaka store on March 6, 2006. From March of 1986 to January of 1990, Dutton served as the Assistant Manager for MBD

Bank.  Dutton was a supervisor for the Collections Department for Crittson Financial Corporation from January of 1990, to August of 1996.  In this capacity, Dutton trained and supervised a staff of 14 employees.  From August of 1996, to August of 2001, he was an insurance agent and owner of American Family Insurance.  Dutton served as a merchant sales representative for Eagle Financial from August of 2001, to September of 2004.  From December of 2004, to August of 2005, Dutton was a loan officer for FMAC Mortgage. Dutton holds a Bachelor of Science in Business Management from the University of Indianapolis.

On June 26, 2006, Bill Knaub ("Knaub") accepted the position of General Manager at the Elkhart store.  Knaub had been the General Manager of Aaron's South Bend store from November of 1996, to April of 2000, and again from June of 2001, until he accepted the General Manager position at Aaron's Elkhart store.  Before his tenure at Aaron's, Knaub worked as the General Manager for the Rent-A-Center in Elkhart for approximately ten (10) years.

On June 26, 2006, Jason Bayles ("Bayles") filled the General Manager position in South Bend.  Bayles worked as a General Manager at Rent-A-Center prior to working at Aaron's.  Bayles began working as a Sales Manager at Aaron's South Bend store on October 28, 2002. He was then promoted from the Sales Manager position to the General Manager position.  At Rent-A-Center Bayles began his career as an Account Manager and also worked his way up to a General Manager

position. During his time at Aaron's before his promotion, Bayles demonstrated good leadership skills and his performance was generally good to excellent.

In February and June of 2006, Lee had never been in a management position outside of his department. He had no experience in interviewing, developing or reviewing the performance of employees. Not until after these positions were filled did Lee notify Aaron's management that he was interested in a General Manager position. Once Lee expressed his interest in a promotion, the management team at Aaron's implemented an Associate Development plan for Lee, in an effort to help him improve his performance and prepare to become a store manager in the future.


Aaron's Drug Testing Policy

Although Aaron's has no record of requiring Lee to undergo a drug test, Lee alleges that he was forced to take a drug test in January of 2001. Aaron's drug testing policy states that all employees must submit to a drug test upon being hired. Without the knowledge or approval of upper management at Aaron's, not all of Aaron's Northern Indiana stores complied with this policy. Between 2001 and 2006, 73% of white employees in Aaron's Northern Indiana stores were drug tested, compared to only 67% of African American employees. Between 2001 and 2006, only 40% of African American employees were drug tested at Aaron's Elkhart store where Lee

worked, whereas almost 54% of white employees were drug tested. Anthony Holmes, with a hire date of December 5, 2005, was the last to be hired of those white employees identified by Lee as not being required to submit to drug testing.

## Aaron's Compensation Decisions

At Aaron's, an employee's compensation is determined by a number of factors. An employee's starting hourly wage depends on previous job experience, previous industry experience, current wage if any, previous wages, job market, position hired to fill, and individual negotiation. Once an individual is hired, Aaron's reviews the employees' performance every six months for a possible increase in hourly rate. Raises are based on performance and can be as high as $1.00 per hour, but typically an employee's hourly rate is increased, if at all, by $0.25 to $0.50 per hour.

Lee began working at Aaron's in October of 2000, at an hourly rate of $8.00. When Lee was terminated in October of 2006, Lee's hourly wage was $13.50. In the year prior to his termination, Lee received a total of $2.00 in hourly pay increases. Soon after February 20, 2006, Lee received a $1.25 per hour raise. In July of 2006, Lee received another $.0.50 per hour raise.

Aaron Anderson ("Anderson") began working at Aaron's on February 9, 1998, as a Product Technician at an hourly rate of $6.50. Anderson consistently performed in the top 20% of his peer

group on objective results. Anderson ranked first in M/E close percentage among all of Aaron's stores from August of 2002 to February of 2007. Anderson was first in nine out of these ten reviews in charge-off percentage. He was second on the other. Further, in sales commission and percent of rent collected, Anderson was consistently in the top half. Anderson also performed well in subjective measures, such as deliveries, certifying merchandise, and closing agreements. Anderson was promoted to General Manager of Aaron's Anderson store on May 7, 2007.

From February of 2004 until his termination of employment in October of 2006, Lee ranked in the bottom 10% of his peer group in close percentages. On four of his reviews in that period, he was rated last among his peers. Lee routinely ranked in the middle of his peer group in charge-off percentages, sales commission and percent of rent collected.

At the time Lee was hired, two years after Anderson began his employment, Anderson earned $9.50 per hour as compared to Lee's starting rate of $8.00 per hour. In June of 2002, Anderson still earned $1.50 per hour more than Lee. By the time Lee was terminated in October of 2006, Lee and Anderson were making the same hourly wage of $13.50 per hour. From June of 2002 to October of 2006, Lee received raises totaling $3.50 per hour, while Anderson received raises totaling $2.00 per hour.

Prior to being hired at Aaron's as a Sales Manager on January

28, 2004, Tammy Collins ("Collins") was the General Manager of Rainbow Rentals from June of 2003, to January of 2004. She was a Sales Associate for Circuit City from September of 2002, to February of 2003. Collins also worked at other Aaron's franchises in Indianapolis, Indiana; Battle Creek, Michigan; and Kalamazoo, Michigan from December of 1994, to June of 2002. Collins earned $13.50 per hour when she began her employment at Aaron's. Collins was eventually promoted to General Manager of Aaron's South Fort Wayne store on April 16, 2007. By the time Lee's employment was terminated, almost two years after Collins was hired, Collins' hourly rate had increased by only $1.00 to $14.50 per hour, while Lee was earning $13.50 per hour.

Melvin Drew ("Drew"), an African-American individual, was hired as a Customer Accounts Manager at Aaron's on May 27, 2003, at an hourly rate of $12.50 per hour. At the time of his hire, Drew was the highest paid hourly worker at Aaron's. Drew's previous work experience included twenty (20) years of management and collection experience, including the General Manager position at Steve's Rent To Own, the General Manager position at JD Byrider, the General Manager position at Tom Kelley/We Finance, and owner of his own buy-here-pay-here used car lot. At the time Drew was hired, Lee was earning $10.75 per hour as a Customer Accounts Manager.

Christopher Fincher ("Fincher"), another African-American

employee at Aaron's, was hired as a Sales Manager on October 31, 2002, at an hourly rate of $11.75 per hour. At the time of his hire, Fincher was the highest paid hourly worker at Aaron's. Prior to working at Aaron's, Fincher was the branch manager for Personnel Management from 1997 to 2002. He supervised a staff of four (4) employees. From December of 1994, to May of 1997, Fincher was the General Manager for Revco (formally Hook's Drugs) and supervised a staff of ten (10) employees. From February of 1988, to December of 1994, he was a Supervisor for the Fort Wayne Developmental Center. At the time Fincher was hired, Lee was earning $10.25 per hour as a Customer Accounts Manager, a comparable position to Sales Manager.

Lee's Poor Performance

During his entire employment with Aaron's, Lee was a marginal performer. At the time of his termination and for at least one year prior, Lee was not performing his job in a satisfactory manner, as objectively evidenced by store performance reports and semi-annual reviews. For example, Aaron's generates a store performance report on a monthly basis, which compares the individual store's performance to the corporate average.

One primary performance category for the Customer Accounts Manager that is tracked on the store performance reports is "M/E Nons" which is short for Month-End Non-renewals. M/E Nons is

calculated by a point system that enables Aaron's to establish standards and goals for non-renewals (collections) that are consistent and fair to all stores. It measures how well the Customer Accounts Manager is able to manage payments from customers on time or as close to the due date as possible. For example, if a customer is 0-3 days late on their agreement at the end of the month, it counts as 0 points. If a customer is 4-16 days late at the end of the month, it counts as 2 points. If a customer is 17-31 days late, it counts as 5 points, and if a customer is 32 or more days late, it counts as 10 points. The M/E Nons percentage is calculated by adding up all of the points and dividing it by the number of customers. The higher the percentage of M/E Nons, the poorer the performance by the store and the Customer Accounts Manager. Aaron's corporate goal is for each of its stores to be at or below 39.9% at the end of the month; however, Aaron's also tracks this percentage against the corporate average.

M/E Nons was a primary indicator of Lee's performance. Lee's M/E Nons percentage at the Elkhart store was consistently higher than the corporate average percentage of M/E Nons, which means he did a poor job, especially comparatively, of managing the on-time payments of the customers at his store. Indeed, in July of 2006, the M/E Nons for the Elkhart store was 123.62% which was 68.22% higher than the corporate average of 55.47%. By comparison, the Muncie store averaged 45.22% for the same month. Lee's M/E Nons

percentages as compared to the corporate average from June of 2005 until his termination of employment in October of 2006, were well above the corporate average except for two months in the fall of 2005.

Starting just one month after Lee's employment was terminated, the Elkhart store always performed well in this category. Although the General Manager remained the same, the Customer Accounts Manager and the Management Trainee that worked in the same department as Lee were fairly inexperienced when they began as a team after Lee left. Yet, their M/E Nons remained below the corporate average until Aaron's management sold the store in April of 2008. The individual who replaced Lee as Customer Accounts Manager was second best among Circle City's Aaron's stores at his next review and in the top 20% of his peer group.

Aaron's semi-annual performance appraisals are based on both objective and subjective measures. Lee's performance appraisals in the year prior to his termination of employment objectively document his poor performance.

In August of 2005, Lee received a rating of 2.9 out of 4 or "Fair/Good," and on the objective performance categories, he was rated in the bottom 10% of his peer group in three categories. Carter advised Lee that his results were lacking.

In March of 2006, Lee's overall rating was slightly better, at 3.3 out of 4, or "Good/Excellent", but he was still rated poorly on

the objective measures of performance. He rated in the bottom 10%
in two of five categories, and slightly better in the other three
categories. He did not rank in the top 20% in any of the objective
categories of his performance appraisal.

In September of 2006 (his last review prior to his
termination), Lee was again rated at 2.9 out of 4, or "Fair/Good."
However, in two of the five objective performance categories, he
rated last.

In addition, Lee had a lengthy history of angry outbursts and
problems with his poor attitude.


Aaron's Employment Decisions Regarding Other Employees

In 2000, Lamphier terminated the employment of John Marshman
(white), the General Manager at the South Bend store, because
Marshman failed to follow company guidelines and procedures.

Todd Kohn's (white) employment was terminated in 2002 because
he made negative statements about the General Manager and the
company to other associates, had a poor attitude, and had a problem
with absenteeism.

Chas MacInnis' (white) employment was terminated by Bill Knaub
in 2002, because MacInnis refused to follow Aaron's sales and
management program.

Richard Zuber's (white) employment was terminated in February
of 2003, for insubordination after he failed to follow direction

from management and left the store before his scheduled ending time.

Aaron's terminated the employment of Ronnie Vadikan (white) for insubordination and a bad attitude after he called the General Manager a dumb ass in a loud and disrespectful manner in front of other associates.

The employment of Scott Kolodchak (white) was terminated by Aaron's after Scott developed a bad attitude and made derogatory comments about other associates.

The employment of Mike Bump and George Foulk (both white) was terminated for poor job performance.

Furlin reviewed James Tidwell's employment file and did not find any unsigned counseling forms. Furlin and Lamphier were not aware that Tidwell refused to sign a counseling form. If Furlin and Lamphier had known that Tidwell refused to sign a counseling form, Tidwell would have been disciplined.


Termination of Lee's Employment

Lee was terminated on October 20, 2006, because of his poor attitude, insubordination and poor performance. Lamphier made the decision to terminate Lee's employment after consultation with Furlin. Even though Lamphier and Furlin considered terminating Lee's employment numerous times before October 20, 2006, Carter rescued Lee's job at various times during Lee's tenure with

Aaron's.

On October 16, 2006, an incident occurred at the Elkhart store involving Lee and Knaub, the General Manager of the Elkhart store. Lee refused to assist Knaub with a customer. Lee became upset and a heated discussion ensued. This angry outburst by Lee occurred in front of customers and other employees. Following the incident, Lee left the store for approximately one hour without permission.

At the request of Lamphier, Knaub prepared a written counseling form. When Lee was shown the form, he refused to sign it and refused to recognize that his behavior was inappropriate. Instead, he stated that he would speak to Lamphier, and Lamphier would ensure that the form was torn up. Lee admitted in his EEOC Charge that he was told that he was being terminated for insubordination.

Lee's Claims

In this Court's previous order of September 24, 2009, the Court noted that Plaintiff appears to have several claims based on discrimination or harassment, and perhaps several claims based on a theory of retaliation. The Court noted that Lee appears to assert at least one but perhaps more than one claim for failure to promote; and claims of discriminatory termination, retaliatory termination, discriminatory use of drug testing, racial harassment and wage discrimination. Unlike the Defendants' prior summary

judgment motion, the instant summary judgment motion addresses each of these claims or potential claims.  Each is now considered here, beginning with Lee's discrimination claims, and then moving to Lee's retaliation and harassment claims.

Lee's Discrimination Claims

Lee's discrimination claims include claims that the decision to terminate his employment was based on race discrimination, that Aaron's failed to promote Lee due to race discrimination, that Lee's drug testing policy was applied in a racially discriminatory manner, and that Aaron's discriminated against Lee by paying him less than similarly situated white employees.

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . ."  42 U.S.C. § 2000e-2(a)(1).

A plaintiff may avoid summary judgment by presenting either direct or indirect evidence that they have been discriminated against.  *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999).  Direct evidence includes allegations that, if believed, will prove a particular fact in question without relying on inferences or presumptions.  *Id.*

Lee has not responded to the instant summary judgment motion, and has not alleged any direct evidence of discrimination. He must therefore utilize the indirect, burden-shifting method established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under the indirect method:

> [A] plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. If the plaintiff makes out a prima facie case, a presumption of discrimination arises, and the burden shifts to the defendant to come forward with evidence of a 'legitimate, nondiscriminatory reason' for discharging the plaintiff. Finally, 'the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 394 (7th Cir. 1998) (quoting *Testerman v. EDS Technical Prods. Corp.*, 98 F.3d 297, 302-03 (7th Cir. 1996)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* framework, Plaintiff must first establish a prima facie case of discrimination by presenting evidence that: 1) he was a member of a protected class; 2) he was qualified for the job in question or was meeting the employer's legitimate performance expectations; 3) he suffered an adverse employment action; and 4) the employer treated other similarly situated employees outside the class more favorably. *Foster v. Arthur Andersen*, *LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999).

-26-

Where the Plaintiff fails to establish a prima facie case of discrimination, the Court need not continue with the burden-shifting analysis. *See Cowan v. Glenbrook Security Servs., Inc.*, 123 F.3d 438, 445 (7th Cir. 1997)("We need not reach the issue of pretext, as plaintiff has failed to state a *prima facie* case of discriminatory discharge under *McDonnell Douglas*.").

Each of Lee's discrimination claims is now examined in turn.

<u>Lee's Claim of Discriminatory Termination</u>

Lee claims that his termination was the result of race discrimination.  Unfortunately for Lee, he cannot prevail on the indirect method because he has failed to show he was meeting his employer's legitimate expectations, and he has failed to show that similarly situated employees outside his protected class were treated more favorably.

<u>Lee's Failure to Demonstrate He Was Meeting Aaron's Legitimate Employment Expectations</u>

Aaron's has produced evidence that at the time of Lee's termination and for at least one year prior, Lee was not performing his job in a satisfactory manner.  Lee had a history of being one of Aaron's marginal performers.  Aaron's asserts that, but for the intervention of Carter (who is accused of racial name-calling), Lee would have been terminated sooner.

Lee's M/E Nons performance was well outside the corporate average from July of 2005 until his termination in October, 2006,

and well outside the goal of 39.9%, except for a two-month period in 2005. As previously explained, M/E Nons is the primary indicator of a Customer Accounts Manager's performance and measures how well the Customer Accounts Manager is able to manage payments from customers on time or as close to the due date as possible. According to Aaron's, Lee's higher percentages than the corporate average meant that he did a very poor job of managing the on-time rental payments by customers. Following Lee's termination, the Elkhart store's M/E Nons rating immediately improved.

Lee's performance appraisals in the year prior to his termination of employment, as discussed previously, document his poor performance. Additionally, Lee demonstrated a poor attitude. According to the Defendants, this attitude exploded on October 16, 2006, when Lee refused to assist his supervisor with a customer and simply walked out on his job in an angry huff. Lee's behavior was directly insubordinate to his supervisor and took place in front of customers and fellow employees. Lee also refused to acknowledge his unacceptable behavior by refusing to sign the counseling form he was given.

Based on the above, Lee cannot demonstrate that he was meeting Aaron's legitimate performance expectations.

<u>Lee's Failure to Demonstrate That Similarly Situated Employees Were Treated More Favorably</u>

A similarly situated individual is one directly comparable "in all material respects." *Bio v. Fed. Express Corp.,* 424 F.3d 593,

597 (7th Cir. 2005); *see also Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002). The only similarly situated individual that Lee points to is James Tidwell. Lee alleges that Tidwell refused to sign a counseling form and was not terminated. Aaron's however, asserts that Furlin reviewed Tidwell's employment file and did not find any unsigned counseling forms. Lee has not presented any evidence to the contrary in response to the instant summary judgment motion. Accordingly, this Court cannot find that Tidwell was similarly situated to Lee.

Furthermore, Aaron's asserts that Tidwell is not similarly situated because, even if he had refused to sign a counseling form, that one act of alleged misconduct would not be comparable to the combination of incidents that led to Lee's termination. This Court agrees.

Because this Court finds that Lee has failed to establish a prima facie case of discriminatory termination, this Court need not continue with the analysis of the pretext issue. *See Cowan*, 123 F.3d at 445. However, even if this Court had examined the pretext issue, due to Lee's failure to respond, the instant motion would be granted as to his claim for racial discrimination stemming from his termination, and he has produced no evidence whatsoever of pretext.

<u>Lee's Claim of Discriminatory Failure to Promote</u>

Lee's claims that he was discriminated against by Defendants when they failed to promote him to the following positions:

(1) General Manager of Aaron's Mishawaka store in March of 2003;

(2) Sales Manager of Aaron's Elkhart store in November of 2005;

(3) General Manager of Aaron's Mishawaka store in February of 2006;

(4) General Manager of Aaron's Elkhart store in June of 2006; and

(5) General Manager of Aaron's South Bend store in June of 2006.

Failure to promote is a discrete and easily identifiable act; accordingly, the continuing violation theory does not apply to claims based on failure to promote. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *see also Heims v. Subaru-Isuzu Automotive Inc.,* No. 4:02-CV-0001, 2003 WL 1086362, *4 (January 10, 2003)("[T]he Court in *Morgan* explicitly designated that the denial of a promotion is an easily identifiable act which cannot be resurrected under the continuing violation doctrine."). Lee, therefore, is limited to claims based on failure to promote occurring within 300 days of when he filed his EEOC charge, or December 24, 2005. Accordingly, the first two of his claims based on failure to promote are untimely.

In order to establish a prima facie case of race discrimination based on failure to promote or transfer, a plaintiff must show that 1) he belongs to a protected class, 2) he applied for and was qualified for the position sought, 3) he was rejected

for that position, and 4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff. *Grayson v. City of Chicago,* 317 F.3d 745, 748 (7th Cir. 2003).

With regards to each of the remaining positions, Lee's claims fail because Defendants have produced evidence showing that Lee did not apply for these positions. Furthermore, the employees who filled the position (Michael Dutton, Bill Knaub and Jason Bayless) were more qualified than Lee. These individuals' qualifications were discussed at length in the facts section, and need not be duplicated here. Additionally, Lee has not established that he is qualified for any of the positions, and Aaron's has set forth a persuasive argument showing that Lee was not qualified for them.

Due to Lee's failure to respond to the instant motion, not only has Lee failed to sustain his burden of demonstrating that he can fulfill the requirements of a prima facie case, but Defendants have stated legitimate, nondiscriminatory reasons for not promoting Lee to each of these positions and Lee has produced no evidence of pretext.

Lee's Claim that Aaron's Drug Testing Policy was Administered in a Discriminatory Fashion

Lee alleges that Aaron's discriminated against him on the basis of his race by requiring him and other African-American employees to undergo drug testing without having the same

requirement for employees outside the protected class. Lee's claim is based on the fact that he was required to submit to drug testing in 2001. Lee points to a number of individuals who he alleges were similarly situated and treated more favorable. However, even the last hired of these identified individuals was hired more than 300 days prior to Lee filing his charge of discrimination. Because Lee has not identified a single act within the 300 day period, the continuing violation theory cannot apply. *See Morgan*, 536 U.S. at 105 (In the context of a hostile work environment claim, finding that "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."). Accordingly, this claim is time barred.

### Lee's Claims Regarding Discriminatory Pay

Lee alleges that Aaron's discriminated against him in the way it compensated him. In response, Aaron's claims that, at various times during Lee's employment at Aaron's, Lee and other African American employees were sometimes paid more than white employees, and sometimes paid less than white employees, and that under such circumstances, summary judgment is appropriate.

Aaron's relies on *Bush v. Commonwealth Edison Co.*, where the Seventh Circuit held that:

> To be free from discrimination is an individual rather than a group entitlement.

> But that principle is engaged only when there
> is evidence of discrimination apart from the
> fact that blacks sometimes are treated better
> than whites and sometimes worse. For that
> fact is not evidence of discrimination at all.

990 F.2d 928, 931 (7th Cir. 1993).

Aaron's claims that its initial compensation decisions are based on numerous factors, including previous job experience, previous industry experience, current wage if s/he is employed, previous wages at former positions, job market, position hired to fill, and individual negotiations. Raises are based on performance, and can be as high as $1.00 per hour, but are more typically between $.25 to $.50 cents.

Lee points to two individuals (Aaron Anderson and Tammy Collins) who were allegedly paid more favorably than Lee, but Lee fails to substantiate his claim. The evidence produced by Aaron's indicates that these individuals were paid comparably to Lee even though Anderson's length of tenure was longer and both individuals had performance ratings that were considerably better than Lee's ratings. Accordingly, Lee's claims based on discriminatory compensation fail.

Lee's Claims of Retaliation

Under Title VII's anti-retaliation provision, it is unlawful for an employer to discriminate against an employee because that employee has opposed an unlawful employment practice or because he

has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing. 42 U.S.C. § 2000e-3(a). In a Title VII retaliation case, as with a discrimination claim, a Plaintiff can proceed under either the direct evidence method or the indirect burden-shifting method. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir. 2002).

Under the direct method of proof, a Plaintiff must demonstrate that he engaged in protected activity under Title VII, he suffered an adverse employment action following his participation in the protected activity, and a causal connection exists between the adverse employment action and his participation in the protected activity. *Oest v. Illinois Dept. of Corrections*, 240 F.3d 605, 615-16 (7th Cir. 2001). Direct evidence is evidence "that, if believed.... would prove the fact in question without reliance on inference or presumption." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)(internal quotations and citations omitted).

Under the indirect method of proof, a prima facie case of retaliation requires a plaintiff to show "that (1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) he was performing his job in a satisfactory manner . . ." *Stone,* 281 F.3d at 642; *see also Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 903

(7th Cir. 2005).

On February 20, 2006, Lee first reported his allegations of discrimination or harassment to Aaron's management. Accordingly, no retaliation could have occurred prior to that date. Lee has not demonstrated a causal connection between his complaints in February of 2006, and any adverse employment actions that followed those complaints. Accordingly, Lee must proceed according to the indirect method of proof.

Under the indirect method, Aaron's concedes that Lee engaged in protected activity on February 20, 2006, but claims he cannot satisfy each of the remaining requirements of his prima facie case. Indeed, Lee has not made any attempt to demonstrate that he was meeting Aaron's legitimate performance expectations, or that he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Thus, Lee's retaliation claim must fail.

Because Lee has not fulfilled his burden of establishing a prima facie case, the Court need not engage in the remainder of the *McDonnell Douglas* burden shifting analysis. *See Cowan*, 123 F.3d at 445.

Lee's Harassment Claims

To establish a prima facie case of hostile work environment, a plaintiff must demonstrate that: (1) he is a member of a

protected class; (2) he was subject to unwelcome harassment; (3) the harassment was on the basis of race; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of the victim's employment and to create an abusive working atmosphere; and (5) there is some basis for employer liability for the harassment." *White v. The Money Store*, No. 97-3056, 142 F.3d 441, *5 (7th Cir. March 17, 1998).

The Seventh Circuit has held that, "[i]n order to survive summary judgment on a hostile work environment claim, a plaintiff must present evidence that would establish that the allegedly hostile conduct was so severe or pervasive as to create an abusive working environment in violation of Title VII." *Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.,* 243 F.3d 336, 342-43 (7th Cir. 2001). In determining whether the conduct is sufficiently severe or pervasive to be actionable, a court will look at all of he circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 343 (internal quotations and citations omitted).

Lee claims 27 separate incidents of racial harassment, as previously outlined. He has, however, not responded to the instant summary judgment motion, and therefore not produced any evidence whatsoever to support these allegations. However, even if this

Court accepts these allegations as true for purposes of the instant summary judgment (which Defendants concede it must), his claim fails.

This Court begins with the timeliness of Lee's claims. Generally, a plaintiff bringing a claim in Indiana pursuant to Title VII must file a charge of discrimination within 300 days of the alleged act of discrimination. *See* 42 U.S.C. § 2000e-5(e); *Tinner v. United Ins. Co.*, 308 F.3d 697, 707 (7th Cir. 2002). Here, all but three of the alleged instances of harassment occurred outside this period: (1) the February 17, 2006, incident where Carter called Lee and said, "hey black boy, when are you coming in, you're fucking late."; (2) the April 2006 incident where Carter announced that "Furlin was giving him until July 2006 to find another job or they were going to fire him" and when asked why, explained that Lamphier said that the niggers had gotten him fired and he couldn't save him this time; and (3) the July 19, 2006, incident where Carter announced he was quitting and stated to Lee "that he didn't have to deal with my black ass anymore because his white ass will be gone in less than a month and he did not care anymore." (Ex. J at 35-37).

However, in some circumstances, the continuing violation theory may apply to allow plaintiffs to recover for discriminatory acts that would otherwise be barred by the applicable statute of limitations. Lee asserts that the continuing violations theory

-37-

applies, and Aaron's contends that it does not. The Supreme Court clarified when the continuing violations theory applies in *Morgan*, 122 S. Ct. at 2068. The Supreme Court, in *Morgan*, stated that:

> discrete discriminatory acts are not actionable if time barred, *even when they are related to acts alleged in timely filed charges*. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the . . . 300-day time period after the discrete discriminatory act occurred.

*Id.* at 2072. An adverse action is a discrete act if "it constitutes a separate actionable 'unlawful employment practice.'" *Id.* 2073. Some such acts are easy to identify, such as termination, failure to promote, denial of transfer or refusal to hire. *Id.* With regard to hostile environment claims, however, the Supreme Court noted "[t]heir very nature involves repeated conduct." *Id.* As a result, the Supreme Court held that "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 2074. Thus, "[i]n order for the charge to be timely, the employee need only file a charge within ... 300 days of any act that is part of the hostile work environment." *Id.* at 2075. A charge involving a hostile work

environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 2077.

Although Lee has raised the issue of continuing violation theory by checking the continuing violation theory box on his EEOC charge, simply raising the issue of whether the continuing violation theory applies has never been sufficient, in and of itself, to survive summary judgment. *See Hall v. Bodine Electric Co.*, 276 F.3d 345, 353-55 (7th Cir. 2002); *Shanoff v. Illinois Dept. of Human Services*, 258 F.3d 696, 703 (7th Cir. 2001); *Dockery v. Dayton Hudson Corp.*, 17 Fed. App. 401, 404 (7th Cir. 2001). Lee likely could have sustained this burden, if he had responded to the instant motion, but he choose not to.

Even if the continuing violation theory did apply, summary judgment is appropriate on Lee's harassment claim. Because Lee's harassment claim does not allege any tangible employment actions, Lee's employer can avoid liability by demonstrating that it acted reasonably to prevent Lee's harassment and that the employee unreasonably failed to take advantage of opportunities to prevent harm. *See Mackenzie v. Potter*, 219 Fed. Appx. 500, 502 (7th Cir. 2007)(citing *Jackson v. County of Racine*, 474 F.3d 493, 501 (7th Cir. 2007) and discussing the Supreme Court's decisions in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)

and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)). This defense has become known as the *Ellerth Faragher* affirmative defense.

Aaron's has a strict anti-discrimination and anti-harassment policy that Lee was aware of throughout his employment. On October 31, 2005, and March 31, 2006, Lee signed a document acknowledging Aaron's anti-discrimination and anti-harassment policy in the workplace. Nonetheless, Lee opted not to report the alleged harassment.

When Lee finally did report some of the alleged harassment, on February 20, 2006, Aaron's took prompt action to correct the harassment. This included conducting an investigation, disciplining Carter, and closely monitoring his performance. Carter quit shortly thereafter, and it is believed by Lamphier and Furlin that his decision to resign was a result of the discipline and monitoring he had experienced. Lee's termination occurred well after Carter, the alleged harasser, had left Aaron's employment.

Retaliatory Harassment

As for any possible retaliatory harassment claim (and it is not entirely clear that Lee intended to stats such a claim), this claim could not arise until after Lee engaged in protected activity on February 20, 2006. Lee identifies only two incidents of harassment that allegedly occurred after February 20, 2006. These

two incidents lack the requisite severity and pervasiveness to support a claim of retaliatory harassment. Furthermore, the *Ellerth Faragher* affirmative defense would be equally applicable to any claim based on retaliatory harassment. *See Allen v. Ohio Dept. of Job and Family Services*, 697 F.Supp.2d 854, 884 (S.D. Ohio 2010).

Additional Matter

This Court notes that, when it denied the Defendants' first motion for summary judgment, the Court was careful to point out the inadequacies of the motion, and to provide direction for the filing of future motions. In response, the Defendants sought leave to file an oversized brief, and this Court granted that motion. Despite having the freedom to file an oversized brief, the Defendants' memorandum failed to include many of the pertinent facts, instead opting to advise the Court where those facts could be located in the attached exhibits. In this case, the Court has went to the added effort of reviewing the facts referenced in the exhibits in large part because this case has been pending far too long, and the Defendants have invested significant resources in seeking summary judgment against a non-responsive Plaintiff. To allow the case to proceed further would be unjust. That said, the Defendants' memorandum is less than professional. The defense attorney's practice of incorporating key facts by reference does

not aide this Court in evaluating the merits of the Defendants'
position. The Defendants' attorney is warned that if this
technique is utilized in the future, he may find this Court less
than obliging.

CONCLUSION

For the reasons set forth above, the motion for summary
judgment is **GRANTED**.

**DATED: September 28, 2010**        **/s/RUDY LOZANO, Judge**
                                    **United States District Court**